# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**INDEX NEWSPAPERS LLC**, et al.,

*Plaintiffs-Appellees*,

v.

**UNITED STATES MARSHALS SERVICE**, et al.,

*Defendants-Appellants*.

On appeal from the United States District Court for the District of Oregon,
Case No. 3:20-cv-1035-SI, Hon. Michael H. Simon

## APPELLEES' RESPONSE BRIEF

**BRAUNHAGEY & BORDEN LLP**
Matthew Borden (CA SBN: 214323)
borden@braunhagey.com
J. Noah Hagey (CA SBN: 262331)
hagey@braunhagey.com
Athul K. Acharya (OR SBN: 152436)
acharya@braunhagey.com
Gunnar Martz (CA SBN: 300852)
martz@braunhagey.com
Ronald J. Fisher (CA SBN: 298660)
fisher@braunhagey.com

351 California Street, 10th Fl.
San Francisco, CA 94104
(415) 599-0210

**ACLU FOUNDATION OF OREGON**
Kelly K. Simon (OR SBN: 154213)

P.O. Box 40585
Portland, OR 97240
(503) 227-6928

*Counsel for Plaintiffs-Appellees*

# CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee Index Newspapers LLC is a Washington limited liability company with two members: Quarterfold, Inc., an Illinois corporation, and Loaded-For-Bear Publishing Co., a Washington corporation. Neither Quarterfold nor LFB is a public company, and the shareholders of Quarterfold and LFB are all natural persons. The remainder of Plaintiffs are individuals.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION .......................................................... 1

QUESTIONS PRESENTED .................................................................... 2

INTRODUCTION ................................................................................ 3

STATEMENT OF THE CASE ................................................................ 6

FACTUAL BACKGROUND.................................................................. 10

    A.    The President Sends Appellants' Federal Agents to Portland .............................................................. 10

    B.    Appellants Target and Disperse Journalists and Legal Observers.................................................................. 12

    C.    The District Court Grants a TRO, but Appellants Immediately Disobey It........................................... 17

    D.    The District Court Grants a Preliminary Injunction.............. 19

    E.    This Court Denies Appellants' Motion to Stay the District Court's Injunction .................................... 25

STANDARD OF REVIEW.................................................................... 28

SUMMARY OF ARGUMENT ............................................................... 29

ARGUMENT...................................................................................... 31

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR FIRST AMENDMENT CLAIMS ................................................... 31

    A.    Plaintiffs Have Standing to Seek an Injunction ................... 31

    B.    Plaintiffs Are Likely to Win on Their Retaliation Claim ...... 38

    C.    Plaintiffs Are Likely to Win on Their Access Claim............. 43

| | | |
|---|---|---|
| 1. | Public Streets, Sidewalks, Parks, and Protests Have Traditionally Been Open to the Press and the Public | 44 |
| 2. | Public Access Plays an Important Role in Holding the Government Accountable | 46 |
| 3. | Appellants' Arguments that the Rights of Journalists and the Public Are Coextensive Are Misplaced | 47 |
| 4. | Appellants' Blanket Dispersal Policy Is Not Narrowly Tailored to Any Legitimate Interest | 49 |
| 5. | Appellants Have No Power to Issue Dispersal Orders on City Streets | 54 |
| 6. | Denying Plaintiffs Access Leaves Them No Alternative Observation Opportunities | 57 |

II. WITHOUT AN INJUNCTION, PLAINTIFFS ARE LIKELY TO BE IRREPARABLY HARMED ................................................. 59

III. THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY IN FAVOR OF PLAINTIFFS ...................................................................... 60

A. The Public Has an Unassailable Interest in a Free Press ....... 60

B. The Preliminary Injunction Is Workable ............................... 62

CONCLUSION ...................................................................... 67

CERTIFICATE OF COMPLIANCE ......................................... 68

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)................................................................31
*Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*,
  950 F.2d 1401 (9th Cir. 1991) ............................................................36
*Associated Press v. Otter*,
  682 F.3d 821 (9th Cir. 2012) ..............................................................60
*Berger v. City of Seattle*,
  569 F.3d 1029 (9th Cir. 2009) ............................................................54
*Bernal v. Fainter*,
  467 U.S. 216 (1984)..............................................................................58
*Board of Airport Commissioners v. Jews for Jesus, Inc.*,
  482 U.S. 569 (1987)..............................................................................50
*Brown v. Entm't Merch. Ass'n*,
  564 U.S. 786 (2011)..............................................................................62
*California First Amendment Coalition v. Calderon*,
  150 F.3d 976 (9th Cir. 1998) ..............................................................49
*Castro v. Cty. of Los Angeles*,
  833 F.3d 1060 (9th Cir. 2016) ......................................................42, 43
*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010)..............................................................................62
*Cmty. House, Inc. v. City of Boise*,
  490 F.3d 1041 (9th Cir. 2007) ......................................................30, 60
*Courthouse News Serv. v. Planet*,
  947 F.3d 581 (9th Cir. 2020) ......................................................45, 49
*Cox Broad. Corp.*,
  420 U.S.................................................................................................46
*Crittenden v. Chappell*,
  804 F.3d 998 (9th Cir. 2015) ......................................................28, 33
*Curtis v. City of New Haven*,
  726 F.2d 65 (2d Cir. 1984) ..................................................................36
*E. Bay Sanctuary Covenant v. Trump*,
  950 F.3d 1242 (9th Cir. 2020) ..................................................28, 29, 31
*Glik v. Cunniffe*,
  655 F.3d 78 (1st Cir. 2011)..........................................................46, 51

iv

*Globe Newspaper Co. v. Superior Court for Norfolk Cty.*,
    457 U.S. 596 (1982)..................................................................45, 62

*Goldman, Sachs & Co. v. City of Reno*,
    747 F.3d 733 (9th Cir. 2014) .............................................31

*Grosjean v. Am. Press Co.*,
    297 U.S. 233 (1936)..........................................................60

*Hague v. Comm. for Indus. Org.*,
    307 U.S. 496 (1939)..........................................................44

*Hartman v. Moore*,
    547 U.S. 250 (2006)..........................................................38

*Husain v. Olympic Airways*,
    316 F.3d 829 (9th Cir. 2002) .............................................28

*In re Zappos.com, Inc.*,
    888 F.3d 1020 (9th Cir. 2018) ...........................................32

*Index Newspapers LLC v. U.S. Marshals Service*,
    977 F.3d 817 (9th Cir. 2020) ......................................passim

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*,
    138 S. Ct. 2448 (2018)......................................................62

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) ......................................passim

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)....................................................passim

*McCullen v. Coakley*,
    573 U.S. 464 (2014)..........................................................50

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .............................................60

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
    192 F.3d 1283 (9th Cir. 1999) .....................................38, 42

*Mills v. Alabama*,
    384 U.S. 214 (1966)..........................................................61

*Moore v. United States*,
    254 F. App'x 603 (9th Cir. 2007)......................................55

*Munns v. Kerry*,
    782 F.3d 402 (9th Cir. 2015) .............................................37

*Nelsen v. King Cty.*,
    895 F.2d 1248 (9th Cir. 1990) ...........................................36

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)..........................................................62

*New York Times Co. v. United States*,
    403 U.S. 713 (1971)..........................................................61

*Nordstrom v. Ryan,*
762 F.3d 903 (9th Cir. 2014) ........................................32, 37

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
460 U.S. 37 (1983)........................................................47, 57

*Press-Enter. Co. v. Superior Court of California,*
464 U.S. 501 (1984)............................................................45

*Press-Enterprise Co. v. Superior Court,*
478 U.S. 1 (1986)..........................................................passim

*Reed v. Lieurance,*
863 F.3d 1196 (9th Cir. 2017)..............................50, 58, 59

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995)............................................................58

*Stoianoff v. Montana,*
695 F.2d 1214 (9th Cir. 1983) ......................................64, 65

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014)............................................................32

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
135 S. Ct. 831 (2015)..........................................................28

*Thomas v. Cty. of Los Angeles,*
978 F.2d 504 (9th Cir. 1992) ......................................passim

*Turner v. Lieutenant Driver,*
848 F.3d 678 (5th Cir. 2017) ..............................................61

*United States v. Baldwin,*
745 F.3d 1027 (10th Cir. 2014) ..........................................55

*United States v. Evans,*
581 F.3d 333 (6th Cir. 2009) ..............................................57

*United States v. Grace,*
461 U.S. 171 (1983)............................................................51

*United States v. Houser,*
804 F.2d 565 (9th Cir. 1986) ..............................................28

*United States v. Morrison,*
529 U.S. 598 (2000)............................................................55

*Updike v. Multnomah Cty.,*
870 F.3d 939 (9th Cir. 2017) ..............................................36

*Valle Del Sol Inc. v. Whiting,*
709 F.3d 808 (9th Cir. 2013) ........................................50, 51

*Vidal v. Wolf,*
2020 WL 6695076 (E.D.N.Y. Nov. 14, 2020)....................56

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989)............................................................54

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ..........................................................31, 59
*Williams v. Birmingham Bd. of Educ.*,
    904 F.3d 1248 (11th Cir. 2018)...........................................................36

## Statutes

18 U.S.C. § 231(a)(1)....................................................................63
18 U.S.C. § 1512(1) ......................................................................64
18 U.S.C. § 1839 ..........................................................................64
26 U.S.C. § 6700(a)(2)(A) ............................................................63
*40 U.S.C. § 1315(b)(1)*.............................................................12, 57
40 U.S.C. § 1315(b)(2) .............................................................55, 56

## Rules

Fed. R. Civ. P. 52(a)(6) ................................................................28
Federal Rule of Appellate Procedure 28 ........................................68

## Regulations

41 C.F.R. § 102-74.385 ................................................................55
41 C.F.R. §§ 102-74.380, 102-74.390 ...........................................55

## STATEMENT OF JURISDICTION

Plaintiffs agree with Appellants' statement of jurisdiction, except that

Plaintiffs have standing for the reasons described *infra* at Part I.A.

# QUESTIONS PRESENTED

1.    Did the district court abuse its discretion by enjoining federal law enforcement from attacking and dispersing journalists and legal observers based on over 35 unrefuted percipient and expert declarations that showed that journalists and legal observers posed no danger to law enforcement or federal property, when the Portland police had been safely and effectively operating under an identical injunction for months?

Plaintiffs-Appellees Index Newspapers LLC, Doug Brown, Brian Conley, Sam Gehrke, Mathieu Lewis-Rolland, Kat Mahoney, Sergio Olmos, John Rudoff, Alex Milan Tracy, Tuck Woodstock, and Justin Yau respectfully submit this Response Brief to the Opening Brief of Defendants-Appellants U.S. Department of Homeland Security ("DHS") and U.S. Marshals Service (collectively, "Appellants").

## **<u>INTRODUCTION</u>**

In a show of force against a Democratic city, President Trump sent untrained and unlawfully designated federal agents to Portland under the command of the "acting" head of DHS. The district court properly enjoined those agents from assaulting and dispersing journalists and legal observers covering the Black Lives Matter protests.

The court's injunction is supported by "extensive and thorough factual findings" that Appellants were retaliating against journalists and legal observers and that Appellants' policy of dispelling the press when breaking up protests does not advance any government interest. *Index Newspapers LLC v. U.S. Marshals Service*, 977 F.3d 817, 827, 833-34, 838 (9th Cir. 2020); (ER 20-31, 43-48, 53-55). These situations are when the free press is needed most, both as a check against government abuse and to provide an independent perspective on the government's account of events.

The injunction is grounded on basic First Amendment principles and the right of access set forth in *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"), and *Leigh v. Salazar*, 677 F.3d 892 (9th Cir. 2012). Public streets, sidewalks and demonstrations have always been open to the public, and "the press has long been understood to play a vitally important role in holding the government accountable." *Index Newspapers*, 977 F.3d at 830-31. Because "the stated need to protect federal property and the safety of federal officers is not directly affected by allowing journalists and legal observers to stay, observe, and record events" (ER 51), Appellants' blanket dispersal policy is not narrowly tailored to achieve any government interest, much less an "overriding" one. *Index Newspapers*, 977 F.3d at 831, 834.

Appellants do not show that the district court's factual findings of retaliation and lack of tailoring are clear error. They argue that the district court improperly created a special right for journalists and legal observers. (AOB 2, 15-16.) But as this Court explained, "the district court did not grant a special exemption to the press; it found that dispersing the press was not essential to protecting the government's interests." *Index Newspapers*, 977 F.3d at 831. Moreover, journalists are engaging in

different activities than protesters and exercising a different right, which is evaluated under a different test.

Appellants' arguments about the workability of the injunction and the supposed danger to law enforcement are foreclosed by the findings and evidence below. This includes over 23 pages of findings by the district court, predicated on (i) over 35 unrefuted declarations and videos from journalists and legal observers, (ii) the unrebutted expert declaration of Gil Kerlikowske, the former Senate-approved Commissioner of Customs and Border Protection and former police chief of Seattle, who policed hundreds of chaotic protests without attacking or dispersing the media, and (iii) the fact that the Portland police had been safely and effectively operating under an identical injunction for several months (as, now, have Appellants).

The balance of equities and public interest also support the injunction. Absent relief, Plaintiffs cannot exercise their First Amendment rights to document the protests. In contrast, letting them do their jobs causes no harm to Appellants, who have their own PR agents recording the protests to tell the government's version of events. Any government interest is further diminished by Appellants' admission that they lack the authority to issue lawful dispersal orders on the city streets, sidewalk, and parks where the protests occur. (SER 114 at 63:12-18; *see also* ER 14-15 & n.2.)

No court has ever held that law enforcement may prevent the press from reporting on how law enforcement is treating demonstrators by excluding them from a public forum. Appellants' argument that they can use violence and fear to monopolize the narrative on Portland's protests is repugnant to the core purpose of the First Amendment.

## **STATEMENT OF THE CASE**

Plaintiffs are a newspaper, journalists, and legal observers.[1] They filed this class action to enjoin the Portland Police Bureau from targeting and dispersing journalists and legal observers covering the Black Lives Matter protests in Portland. (Dist. Ct. Dkt. 1.)

On June 30, 2020, Plaintiffs moved for a temporary restraining order against Defendant City of Portland, which the City opposed as unworkable. (Dist. Ct. Dkt. 7.) On July 2, the district court entered a temporary restraining order ("TRO") forbidding the police from "arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal

---

[1] Legal observers work for the American Civil Liberties Union or National Lawyers' Guild and wear blue "ACLU" vests or green "NLG" hats to identify themselves. They attend protests to document events and to report their observations to their organizations.

Observer." (ER 182.) After the TRO proved workable, the City stipulated to a preliminary injunction containing materially identical terms. (ER 177.)

Around the same time, federal agents began policing protests in Portland. (ER 160-161 ¶ 5.) They too targeted and dispersed reporters and legal observers. (ER 20-31.) Plaintiffs amended the complaint to include Appellants and moved for a TRO against them. (Dist. Ct. Dkts. 53, 54.)

On July 23, after a hearing that ran for more than an hour and a half (SER 287-328), the district court granted a TRO against Appellants that was identical to the one it entered against the City and allowed both sides to take expedited discovery. (ER 91-94.) On July 28, Plaintiffs moved to hold Appellants in contempt. (Dist. Ct. Dkt. 85.) On July 30, Appellants moved to dissolve the TRO. (Dist. Ct. Dkt. 101.) On July 31, after another hour-and-a-half hearing (SER 194-250), the court held the contempt motion in abeyance and set the motion to dissolve the TRO to be jointly heard with a motion to extend to the TRO. (Dist. Ct. Dkt. 108.) On August 4, Plaintiffs moved to extend the TRO another 14 days. (Dist. Ct. Dkt. 112.) After extensive argument on the two motions (SER 117-172), the district court denied Appellants' motion and extended the TRO. (Dist. Ct. Dkt. 126.)

The parties stipulated that the district court could decide the motion for preliminary injunction on the basis of declarations, without live testimony. (SER 115.) On August 18, the district court held a hearing on the motion for preliminary injunction that lasted over two hours. (SER 12-97.) By that point, Plaintiffs had submitted dozens of declarations by journalists and legal observers, all of which showed that federal agents were shooting, tear-gassing, threatening, and arresting journalists and legal observers even when there were no protesters nearby. (SER 173-193, 251-286, 329-377, 382-430.)

On August 20, the district court issued a 61-page opinion. It found that Plaintiffs were likely to prevail on their claim that Appellants had retaliated against Plaintiffs and other journalists and legal observers (ER 42-50); that dispersing journalists and legal observers was not tailored to any legitimate government interest (ER 50-56); and that permitting Appellants to continue doing so would irreparably harm Plaintiffs and the public interest (ER 56-66). Based on these findings, it enjoined Appellants from "arresting, threatening to arrest, or using physical force directed against any person whom they know or reasonably should know is a Journalist or Legal Observer." (ER 67.)

The next day, Appellants took an interlocutory appeal to this Court. (Dist. Ct. Dkt. 158.) They sought a stay pending appeal and an emergency "administrative" stay pending a decision on the stay. (Dkt. 7.) A divided motions panel granted the administrative stay in a one-paragraph order. (Dkt. 14.) Judge McKeown dissented. (*Id.*)

On September 17, a different motions panel heard argument on the motion for stay pending appeal. (Dkt. 30.) Three weeks later, it issued a 76-page published opinion. (Dkt. 34.) In it, this Court held that Appellants had not met any of the requirements for granting a stay. This Court held that "exceptionally strong eviden[ce]" supported the district court's findings that Appellants had retaliated against Plaintiffs and that dispersing Plaintiffs was not narrowly tailored to protect an "overriding interest based on findings that closure is essential to preserve higher values." *Index Newspapers*, 977 F.3d at 827-34.

This Court further held that Appellants had not shown that they would suffer irreparable harm without a stay because the evidence showed that law enforcement could safely follow the injunction. *Id.* at 834-37. This Court concluded that a stay would harm Plaintiffs because it would chill the exercise of their First Amendment rights, harm the City because the City was bound to exempt Plaintiffs from dispersal orders, and harm the

public interest because journalists "provide a vitally important service to the public." *Id.* at 837-38. For all these reasons, it lifted the administrative stay and denied Appellants' motion for a stay pending appeal. *Id.*

## FACTUAL BACKGROUND

On May 25, 2020, Minneapolis police killed George Floyd, sparking protests nationwide. For more than 100 straight nights, Portlanders gathered around the city to protest against police brutality and racism.[2] Plaintiffs are journalists and legal observers documenting these protests. None of them engages in the protests, and all of them are clearly marked. (ER 18-20.)

### A. The President Sends Appellants' Federal Agents to Portland

Almost as soon as the protests began, President Trump deployed federal law-enforcement agents to Portland from Immigrations and Customs Enforcement, Customs and Border Patrol, the Federal Protective Service, and the U.S. Marshals Service to "dominate" the protesters and

---

[2] Nathan Rott, *Portland Sees 100th Day Of Protests For Racial Justice*, NPR (Sep. 6, 2020), https://www.npr.org/2020/09/06/910194829/portland-sees-100th-day-of-protests-for-racial-justice.

"quell" the Black Lives Matter protests.[3] Oregon Governor Kate Brown stated that "[t]his political theater from President Trump has nothing to do with public safety," and that "[t]he president is failing to lead this nation. Now he is deploying federal officers to patrol the streets of Portland in a blatant abuse of power by the federal government."[4] The President publicly responded that the protesters were "anarchists who hate our Country," and criticized the "Lamestream Media" as complicit because they "want the American public to believe that these are just some wonderful protesters, not radical left ANARCHISTS!"[5] The federal agents sent to Portland included a Public Affairs Specialist to video and document the protests and law enforcement. (ER 151 ¶ 2.)

An internal DHS memorandum leaked to the public stated that the agents the President had deployed to Portland were not trained in handling

---

[3] Demitri Sevastopulo, *Trump vows to deploy US military to quell protests*, Financial Times (June 1, 2020), https://www.ft.com/content/ed7dc274-f9d7-4377-b9f8-015dfc972aa4.

[4] Aaron Mesh, *Oregon Gov. Kate Brown Says President Trump Is Invading Portland as an Election Stunt*, Willamette Week (July 16, 2020), https://www.wweek.com/news/2020/07/16/oregon-gov-kate-brown-says-president-trump-isinvading-portland-as-an-election-stunt/.

[5] @realDonaldTrump, Twitter (July 26, 2020, 3:37 P.M.), https://twitter.com/realDonaldTrump/status/1287517470497083393; @realDonaldTrump, Twitter (July 26, 2020, 12:37 P.M.), https://twitter.com/realDonaldTrump/status/1287472054527197190.

civil unrest.[6] The DHS Office of the Inspector General later reiterated this, and further found that the federal agents that had been sent to Portland were illegally deployed because the government had not made an individualized determination that any of them were sufficiently trained to police the protests.[7]

### B. Appellants Target and Disperse Journalists and Legal Observers

On July 4, federal agents began policing the protests. Their appearance "inflame[ed] tensions" and "escalat[ed] violence" at the protests. (ER 4; SER 379.) Each night, the critical inflection point came when law enforcement declared an unlawful assembly and began dispersing protesters. It was then that federal agents shot 26-year-old

---

[6] Sergio Olmos, Mike Baker, & Zolan Kanno-Youngs, *Federal Officers Deployed in Portland Didn't Have Proper Training, D.H.S. Memo Said*, N.Y. Times (July 18, 2020), https://www.nytimes.com/2020/07/18/us/portland-protests.html; see also https://int.nyt.com/data/documenttools/dh-stacticalagent-memo2/bcc35f3303958cac/full.pdf (admitting that DHS officers assigned to Portland "do not specifically have training in riot control or mass demonstrations").

[7] Joseph V. Cuffari, *Management Alert—FPS Did Not Properly Designate DHS Employees Deployed to Protect Federal Properties under 40 U.S.C. § 1315(b)(1)*, DHS Office of Inspector General (Nov. 2, 2020), *available at* https://www.oig.dhs.gov/sites/default/files/assets/2020-11/OIG-21-05-Nov20.pdf ("Yet we identified several individuals who deployed to Portland but whom FPS could not confirm received training on section 1315. Some of these individuals used force while deployed to Portland.").

Donovan La Bella in the head, causing him brain damage, when he was simply holding a speaker in the air;[8] beat former Navy officer Christopher David while he tried to talk to them;[9] and tear-gassed a "Wall of Moms."[10]

In addition to dispersing protesters, federal agents were targeting and dispersing journalists and legal observers to prevent them from reporting on what federal agents were doing. (*See* ER 51.) The events above were nonetheless captured by Plaintiffs and other journalists and legal observers who had defied law enforcement's orders to disperse. (SER 324-325.)

To enable Plaintiffs to safely document the protests, Plaintiffs added Appellants as defendants and moved for a TRO. Thereafter, Appellants redoubled their assaults on the media and legal observers. For example:

- Federal agents shot Plaintiff Mathieu Lewis-Rolland ten times in the back and side, all above the waist, even though he was

---

[8] Jonathan Levinson, *Donavan La Bella, man shot by US Marshals in Portland, to be released from hospital*, OPB (July 25, 2020), https://www.opb.org/news/article/donavan-labella-portland-condition-shot-head-federal-officer/.

[9] John Ismay, *A Navy Veteran Had a Question for the Feds in Portland. They Beat Him in Response*, N.Y. Times (July 20, 2020), https://www.nytimes.com/2020/07/20/us/portland-protests-navy-christopher-david.html.

[10] Marissa J. Lang, *'What choice do we have?': Portland's 'Wall of Moms' faces off with federal officers at tense protests*, Washington Post (July 22, 2020), https://www.washingtonpost.com/nation/2020/07/22/portland-moms-protests/.

marked "PRESS" and snapping photos in a well-lit area so that they could see he was press. (SER 420-423 ¶¶ 13-16.)

- They shot journalist Garrison Davis in the back with a tear-gas canister and sprayed him with pepper bullets even though he was wearing a helmet marked "PRESS" and displaying his press pass. (SER 426-429 ¶¶ 4, 13-14.)

- They chased legal observers wearing green NLG hats away from the courthouse, threatening to beat them. (*Id.* ¶ 16.)

- They shot a tear-gas canister at Plaintiff Justin Yau, even though he was also marked "press." (SER 410-411 ¶¶ 3, 6; ER 21.)

- They shot and threatened to shoot Plaintiff Doug Brown, an ACLU legal observer, and several journalists. (SER 414-415 ¶¶ 11-13.)

- They threw flashbang grenades at journalist Eddy Binford-Ross on three separate occasions and rolled a tear-gas canister at her. (SER 345-348 ¶¶ 6, 9, 15.)

- They shot Plaintiff John Rudoff near the neck with a 40mm rubber bullet, barely missing his head, even though he was marked "PRESS" all over. (SER 401-404 ¶¶ 3-7.)

- They shot Plaintiff Alex Milan Tracy in the ankle with an impact munition, causing ligament damage, and in the elbow with pepper balls. (SER 398-399 ¶¶ 5, 8.)

- They shot NLG legal observer Nate Haberman-Ducey in the hand with an FN 303 riot gun. (SER 395 ¶ 4; ER 23.)

- They shot clearly marked journalist Jungho Kim in the chest with a marker round. (SER 390-391 ¶¶ 2, 7; ER 22.)

- They shot legal observer James Comstock in his hand and a nearby journalist in his camera lens. (SER 386-387 ¶¶ 4-5; ER 24-26.)

- They told journalist Nathan Howard to stay where he was; he did, and then they shot him anyway. (SER 407 ¶¶ 6-7; ER 22.)

- They shot journalist Noah Berger in the stomach and the elbow, beat him with their batons, and pepper-sprayed him at point-blank range. (SER 371-373 ¶¶ 4-11; ER 21-22.)

- They shot journalist Jake Johnson in the stomach with a rubber bullet, only a few inches to the right of where his camera was hanging. (SER 383-384 ¶¶ 6-7.)

- They shot Karina Brown, a female journalist, twice in the buttocks at near point-blank range. (SER 377 ¶¶ 11-13.)

- They pepper-sprayed journalist Mike Bivins at point-blank range. (SER 367 ¶¶ 4-6.)

- They shot pepper balls and threw a tear-gas grenade at Plaintiff Lewis-Rolland. (SER 355 ¶ 10.)

- They shot a flash-bang grenade at Plaintiff Tracy and another journalist, and shot a third journalist with an impact round. (SER 364 ¶¶ 7-9; ER 25.)

- They fired three smoke grenades at Plaintiff Mahoney, striking her left knee and right foot. She managed to dodge the third. (SER 361 ¶¶ 12-13.)

- They shot journalist Steve Hickey in the head, twice. The first time, he managed to block it with his arm. The second time, they hit his head. (SER 335-336 ¶¶ 5-13.)

- They shot Plaintiff Rudoff again, this time in the shin. (SER 339-340 ¶¶ 5-7.)

- They shot journalist Gabriel Trumbly in the hand. (SER 331-332 ¶ 5.)

**C.    The District Court Grants a TRO, but Appellants Immediately Disobey It**

Based on these incidents, the district court granted a TRO against Appellants. (ER 74.) But Appellants' agents continued to shoot, beat, and intimidate journalists and legal observers:

- They shot Plaintiff Mahoney and legal observer Rachelle Collins in the head with paint bullets. Both were wearing blue ACLU vests. (SER 256-257 ¶¶ 5-8.)

- They maced Ms. Mahoney and Bruce Knivila, who were wearing blue ACLU vests, along with two other legal observers wearing green NLG hats. (SER 257-258 ¶¶ 9-12; SER 264-265 ¶¶ 3-10.)

- They tear-gassed a whole section of press and legal observers. (SER 264-265 ¶ 8.)

- They shot reporter Rebecca Ellis and forced her away from the scene of enforcement actions. (SER 279 ¶¶ 3-5; ER 28.)

- They shot Brian Conley in the chest and foot when there were no protesters near him; threw a tear-gas canister at his head; and on a different night, shot him again and threw multiple flash-bang grenades at him. (SER 282-286 ¶¶ 6-10, 18-24; ER 25-27.)

- They shot reporter Jonathan Levinson while there was almost no one else around. (SER 264 ¶¶ 4-6; ER 31.)

- They shot Agence France-Presse photographer Kathryn Elsesser when there was no one else around. (SER 274-275 ¶¶ 4-6; ER 28-29.)

- They shot VICE reporter Daniel Hollis while he was with a group of press and several yards from the nearest group of protesters, who were themselves neither threatening nor doing anything illegal. (SER 268 ¶¶ 4-7; ER 30-31.)

- They shot NLG legal observer Haley Nicholson in the chest from four feet away. (SER 252-254 ¶¶ 3-7.)

- They kicked a flash-bang grenade and shot tear gas at *PSU Vanguard* managing editor Justin Grinnell. Both times, he was among only journalists, with no protesters around. (SER 271-272 ¶¶ 3-8.)

- They shot and tear-gassed journalist Amy Katz with no protesters nearby, and later shoved her to prevent her from recording a violent arrest. (SER 182-183 ¶¶ 5-10; ER 23-24, 27.)

- They shoved *New York Times* and *New Republic* reporter Sarah Jeong down the courthouse steps. (SER 188-189 ¶¶ 5-7; ER 24.)

- They pepper-sprayed Plaintiff Brian Conley at point-blank range not long after recognizing him as press. (SER 191-192 ¶¶ 5-7.)

- They shot journalist Emily Molli in the arm while she was recording them. (SER 177-179 ¶¶ 5-7; ER 29-30.)

- They shot a group of clearly marked journalists—all of whom were holding up their press passes, yelling that they were press, and taking pictures—with a barrage of impact munitions and tear gas. (SER 183-184 ¶¶ 11-12; SER 177-178 ¶¶ 8-9; ER 27-28.)

- They shot tear gas at a group of journalists three times on July 29. (SER 179 ¶ 10.)

Many of these events were captured on video, which the district court reviewed and analyzed extensively. (ER 26-31, 46-48.)

## D. The District Court Grants a Preliminary Injunction

On August 10, Plaintiffs moved for a preliminary injunction. In addition to the facts above, Plaintiffs submitted testimony from federal agents and the expert declarations of Gil Kerlikowske, the former Senate-confirmed Commissioner of U.S. Customs and Border Protection, Chief of Police of Seattle, WA, and Police Commissioner of Buffalo, NY. (ER 121 ¶ 1; SER 110-111.[11]) Mr. Kerlikowske explained that he had overseen the policing of hundreds of larger and more chaotic protests in Seattle, and had

---

[11] Appellants' characterization of Mr. Kerlikowske as simply a "retired law-enforcement official" (AOB 34) mischaracterizes the record.

not targeted or dispersed journalists or legal observers. (ER 121-124 ¶¶ 3-4,
¶ 15.) He further explained that Appellants' federal agents were not
properly trained and did not have a proper command structure for policing
protests. (ER 123-127 ¶¶ 8-9, 23-25, 28-29.)

In response, Appellants mostly relied on evidence the district court
had already seen. They did not challenge Mr. Kerlikowske's testimony or
depose him. (ER 5.) After the motion was argued and submitted, they filed
a declaration from one of Mr. Kerlikowske's former subordinates, whom
the district court found unpersuasive. (ER 5-6; ER 102; ER 32-34 & n.4.)

On August 20, the district court issued a 61-page opinion and order
granting a preliminary injunction with materially similar terms as the TRO.
(ER 10.) First, it found Plaintiffs had standing to seek injunctive relief:
"The combination of the Federal Defendants' repeated past conduct,
Plaintiffs' stated intentions, and the Federal Defendants' stated intentions
establish the 'real and immediate threat of repeated injury' sufficient to
create standing." (ER 37-41; ER 83-84 (quoting *Lyons*, 461 U.S. at 102).)

The district court then held that Plaintiffs were likely to succeed on
their First Amendment retaliation claim. (ER 42-50.) It found that
Plaintiffs' declarations and videos showed "situations in which the
declarants were identifiable as press, were not engaging in unlawful

activity or even protesting, were not standing near protesters, and yet were subjected to violence by federal agents under circumstances that appear to indicate intentional targeting." (ER 49-50.) It found that because of this intentional targeting, "journalists and legal observers were forced to stop newsgathering, documenting, and observing for minutes, hours, or days due to injury and trauma." (ER 44.) On this basis, it held that "Plaintiffs[] have shown the elements of First Amendment retaliation." (ER 50.)

The district court also held that Plaintiffs were likely to succeed on their claim that they had a right to access to observe and record law-enforcement activity on public streets and sidewalks. (ER 50-56.) It first observed that public streets and parks are traditionally open to the public and that "[w]ithout journalists and legal observers, there is only the government's side of the story to explain why a 'riot' was declared and the public streets were 'closed' and whether law enforcement acted properly in effectuating that order." (ER 51.) It then found that the record, including Plaintiffs' expert evidence and the City's experience under the similar injunction, "belie[d]" Appellants' argument that "dispersing everyone is as narrowly tailored as possible" and that "to allow anyone to stay after a dispersal order is not practicable or workable." (ER 53.) It thus held that

Plaintiffs had shown sufficient likelihood of success on their right-of-access claim. (ER 56.)

The district court then held that Plaintiffs were likely to suffer irreparable injury to their First Amendment rights without an injunction (ER 56-64), and that the balance of equities and public interest favored enjoining Appellants from targeting journalists and legal observers at protests (ER 64-66). It noted that Plaintiffs had submitted evidence both before and after the TRO showing that journalists had been prevented from covering the protests and chilled from "returning to cover the protests in the future." (ER 59.) Accordingly, it held that Appellants' "past violations are highly suggestive of future harm." (ER 63.)

The district court also found that Appellants' evidence that they would suffer harm under an injunction was mostly "ambiguous" and showed conduct that was "not unlawful." (ER 65.) Even if "a few people may have engaged in some unlawful conduct," it held, that would not "outweigh the important First Amendment rights of journalists and legal observers and the public for whom they act as surrogates," especially given that there was "no evidence that any of the named Plaintiffs engaged in any of the purported unlawful conduct described by the Federal Defendants." (ER 65-66.)

The district court found Mr. Kerlikowske to be "a well-qualified expert whose opinions are relevant, helpful, and persuasive" (ER 32, 34) and adopted nearly all his testimony, including:

- that "the prohibitions contained in the TRO are safe for law enforcement personnel," whether stationed in a defensive perimeter around the courthouse or venturing afield;

- that "the TRO is workable"; that "trained and experienced law enforcement personnel are able to protect public safety without dispersing journalists and legal observers and can differentiate press from protesters, even in the heat of crowd control"; and that any difficulties Appellants faced were because of "their lack of training, experience, and leadership with experience in civil disturbances and unrest";

- that "virtually all the injuries suffered by the complaining journalists were the result of improper use of force"; and

- that "a key duty and responsibility of law enforcement is to be properly and easily identifiable specific to the organization and the individual."

(ER 32-34; *see also* ER 49, 53-55; ER 5-6.)

Based on its findings, the district court ordered that journalists and legal observers "shall not be subject to arrest for not dispersing following the issuance of an order to disperse," but "shall, however, remain bound by all other laws." (ER 67 ¶ 1.) It also recognized that federal agents were free to issue "otherwise lawful crowd-dispersal orders for a variety of lawful reasons." (ER 69 ¶ 6.)

To assist federal agents with identifying journalists and legal observers, the district court offered a number of commonsense, non-exclusive indicia, including wearing visual identifiers such as press passes, standing off to the side of protests, not engaging in protest activities, not intermixing with protest activities, and carrying professional-grade photographic equipment. (ER 68-69 ¶¶ 4-5.)

The district court included several provisions to allay concerns raised by Appellants. Federal agents remained free to arrest journalists and legal observers with "probable cause to believe that such individual has committed a crime" other than failure to disperse. (ER 67 ¶ 1.) The court also ordered that journalists and legal observers may not "impede, block, or otherwise physically interfere with the lawful activities of the Federal Defendants." (*Id.*) And it shielded federal agents from liability "if a Journalist or Legal Observer is incidentally exposed to crowd-control

devices after remaining in the area where such devices were deployed after the issuance of an otherwise lawful dispersal order." (ER 69 ¶ 6.)

### E. This Court Denies Appellants' Motion to Stay the District Court's Injunction

After full briefing, consideration, and 20 minutes of argument per side, this Court denied Appellants' motion to stay the District Court's injunction on the merits. *Index Newspapers*, 977 F.3d at 817.

First, this Court held that Plaintiffs had standing to seek injunctive relief. It held that Plaintiffs' injury was "not speculative" because Plaintiffs had introduced "powerful evidence of the Federal Defendants' ongoing, sustained pattern of conduct that resulted in numerous injuries to members of the press." *Id.* at 826. It also held that Appellees' conduct had "chilled [Plaintiffs'] First Amendment rights," which was an "ongoing" injury that also conferred standing to seek injunctive relief. *Id.* at 826-27.

Next, this Court held that Appellants were unlikely to defeat Plaintiffs' retaliation claim because "the district court's extensive and thorough factual findings provide robust support for its conclusion that plaintiffs' exercise of their First Amendment rights was a substantial or motivating factor in the Federal Defendants' conduct." *Id.* at 827. In particular, it highlighted the "many instances in which plaintiffs were

standing nowhere near protesters while photographing and observing the Federal Defendants' actions." *Id.* at 829.

This Court also held that Appellants were unlikely to defeat Plaintiffs' right-of-access claim. The Court began by rejecting Appellants' contention that the district court had applied the wrong legal standard, and held that the district court had correctly applied the framework established in *Press-Enterprise II* and *Leigh*. *Id.* at 829-31. In applying that test, this Court noted that Portland's streets and sidewalks, as well as public protests and law enforcement's response to them, have "historically been open to the public." *Id.* at 830. This Court further noted that "the press has long been understood to play a vitally important role in holding the government accountable." *Id.* at 831.

This Court further rejected Appellants' argument that the district court had "grant[ed] a special exemption to the press," and explained that rather, the district court had "found that dispersing the press was not essential to protecting the government's interests." *Id.* This Court went on to explain that that finding was well-supported by Mr. Kerlikowske's testimony, as well as by the City's ability to comply with a similar injunction. *Id.* at 832-33. In addition, this Court expressed doubt that

Appellants had the legal authority to "disperse members of the public who are neither on nor threatening federal property." *Id.*

The Court next held that Appellants would suffer no harm from complying with the injunction. It explained that the injunction both set forth "unambiguous" rules to prohibit federal agents from dispersing members of the press and legal observers and also "unambiguously" shielded federal agents from liability for "violating the preliminary injunction by incidentally exposing journalists or legal observers to otherwise lawful crowd-control measures." *Id.* at 834-35. Thus, this Court held, "[t]he terms of the injunction itself adequately address" Appellants' workability concerns. *Id.* at 835-37.

Finally, this Court held that the public interest in protecting federal property and personnel could be served without dispersing journalists and legal observers. *Id.* at 837-39. It explained that "the record fully supports the district court's conclusion that the Federal Defendants' interest does not require dispersing plaintiffs. They have not threatened federal property, and the journalists, in particular, provide a vitally important service to the public." *Id.* For all these reasons, it denied Appellants' request for a stay pending appeal and lifted the previously granted administrative stay.

## STANDARD OF REVIEW

This Court reviews a grant of a preliminary injunction for an abuse of discretion. *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1271 (9th Cir. 2020) ("*E. Bay II*"). It accepts a district court's findings of fact unless they are clearly erroneous. *Id.* The clear-error standard applies "to both subsidiary and ultimate facts," and it applies regardless of whether the findings were based on oral or documentary evidence. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015); *Crittenden v. Chappell*, 804 F.3d 998, 1006 (9th Cir. 2015) (citing Fed. R. Civ. P. 52(a)(6)). Even if this Court is "convinced it would have found differently" in the first instance, it accepts the district court's findings if they are "plausible in light of the record viewed in its entirety." *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002), *aff'd*, 540 U.S. 644 (2004).

When a motions panel has already decided some of the issues raised on the merits, the merits panel "should not 'lightly overturn a decision made by [the] motions panel.'" *E. Bay II*, 950 F.3d at 1262 (quoting *United States v. Houser*, 804 F.2d 565, 568 (9th Cir. 1986)). That is especially so where, as here, the motions panel reached its decision with the benefit of extended oral argument, after almost a month of deliberations, on the same

record presented on the merits, and in a thoroughly reasoned and lengthy published opinion. *See id.* at 1263.

## SUMMARY OF ARGUMENT

Plaintiffs have standing to seek an injunction because they introduced "powerful evidence" that Appellants were targeting and dispersing them. *Index Newspapers*, 977 F.3d at 825-27; (ER 20-31). Appellants rely on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) to argue that Plaintiffs were under no real and immediate threat of future injury, but *Lyons* is inapposite both because Plaintiffs documented repeated incidents of targeting and retaliation, and because a First Amendment chilling effect is an ongoing injury. *Index Newspapers*, 977 F.3d at 826 (quoting *Thomas v. Cty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992)).

Plaintiffs are likely to win on their retaliation claim. The district court found that federal agents frequently shot Plaintiffs when they were "standing nowhere near protesters" but merely "photographing and observing the Federal Defendants' actions," and this Court held this finding fully supports the district court's finding of retaliatory animus. *Index Newspapers*, 977 F.3d at 828-29; (ER 43-48).

Plaintiffs are likely to win on their right-of-access claim. Public streets and parks have historically been open to the press and general

public. *Index Newspapers*, 977 F.3d at 830. Permitting press to record and report on law enforcement's uses of force enhances accountability to the public. *Id.* at 831. Thus, Plaintiffs have a qualified right of access. *Leigh*, 677 F.3d at 900. Appellants cannot overcome this right because the district court made extensive findings that their blanket dispersal policy is not narrowly tailored, and those findings are not clearly erroneous. (ER 53-54); *Index Newspapers*, 977 F.3d at 831-34. In any event, they may lack the power to issue dispersal orders off federal property entirely.

Without an injunction, Plaintiffs would have ben irreparably harmed. The district court found that Appellants' conduct chilled and prevented journalists from reporting on the protests (ER 44-45) and Appellants do not challenge those findings here. (AOB 28-29.)

Because Plaintiffs have at least raised serious First Amendment questions, the balance of hardships tips sharply in their favor. *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007). Appellants argue nevertheless that the preliminary injunction is unworkable (AOB 29-37), but this seeks to reweigh the evidence. Based on the City's ability to work under the same restrictions and expert testimony from Mr. Kerlikowske, the district court found that its carefully tailored injunction was workable, and the record "fully supports the district court's conclusion." *Index*

*Newspapers*, 977 F.3d at 838. Thus, the injunction properly balanced the equities and served the public's interest.

## ARGUMENT

Plaintiffs seeking a preliminary injunction must show that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in their favor; and (4) an injunction is in the public interest. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 738 (9th Cir. 2014). These factors are evaluated on a "sliding scale": Plaintiffs who show that the balance of hardships tips "sharply" in their favor need only raise "serious questions" going to the merits. *E. Bay II*, 950 F.3d at 1271; *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Warsoldier v. Woodford*, 418 F.3d 989, 993-94 (9th Cir. 2005) ("[T]he greater the relative hardship to [plaintiff], the less probability of success must be shown." (quotation marks omitted)). The district court did not abuse its discretion in issuing the injunction here.

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR FIRST AMENDMENT CLAIMS

### A. Plaintiffs Have Standing to Seek an Injunction

To obtain prospective injunctive relief, Plaintiffs must show either that they are threatened with "real and immediate" future injury or that

"there is a substantial risk the harm will occur." *Thomas*, 978 F.2d at 507 (quotation marks omitted); *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). When a plaintiff has suffered "actual repeated [injuries]" at the hands of the defendant, the threat of future injury is sufficiently immediate, especially if the injuries were inflicted as "part of a pattern of officially sanctioned behavior." *Thomas*, 978 F.2d at 507 (quotation marks omitted); *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) (cleaned up).

As this Court found, Plaintiffs easily satisfy this standard. *Index Newspapers*, 977 F.3d at 825-27. The district court's finding that Appellants targeted Plaintiffs with rubber bullets, flash-bang grenades, batons, and other physical violence was not clear error; to the contrary, it was overwhelmingly supported by the evidence in the record—both testimony and video. (SER 173-193, 251-286, 329-377, 382-430.) The district court included many such incidents in its findings of fact. (ER 20-31.) For just a few examples: Plaintiff Conley was shot with impact munitions and flash-bang grenades, pepper-sprayed at point-blank range, and targeted with tear gas at least seven times over the course of three different days. (ER 25-27.) In a single night, Noah Berger had two separate

encounters in which federal agents shot, beat, and pepper-sprayed him, even though he was holding up his press pass and identifying himself as press. (ER 21.) A group of federal agents charged at Plaintiff Tracy, shot him with a flash-bang grenade, and continued to threaten him until finally he stopped reporting for the night. (ER 25.) This Court highlighted several others in denying Appellants' request for a stay. *Index Newspapers*, 977 F.3d at 827-28.

As this Court held, the district court's findings describe "at least forty-five" similar incidents over the course of 15 days. *Id.* at 828-29; (ER 20-31).[12] Many of these examples include video and photographic evidence. (*E.g.*, ER 26-27, 29-30 (citing SER 283 ¶¶ 7-10; SER 183-184 ¶¶ 10-12; SERR 178-80 ¶¶ 7-11; SER 268 ¶¶ 5-7).) All these incidents are unrebutted, and the district court's factual findings as to each are entitled to clear-error review. *Index Newspapers*, 977 F.3d at 826; *Crittenden*, 804 F.3d at 1006.

As they did in their stay papers, Appellants "rel[y] primarily on *Lyons*" to argue that Plaintiffs were under no "real and immediate threat"

---

[12] As the district court pointed out, its selection of incidents is not a complete list. (ER 21 ("There are more.")); *see Index Newspapers*, 977 F.3d at 828-29.

that federal agents would violently disperse or retaliate against them when the district court entered its injunction. *Index Newspapers*, 977 F.3d at 825; (AOB 23). As this Court held, however, given the district court's factual findings, *Lyons* is inapposite for at least four reasons.

*First*, it is inapposite because Plaintiffs documented "actual repeated incidents" in which federal agents targeted journalists and legal observers. *Index Newspapers*, 977 F.3d at 826 (quoting *Thomas*, 978 F.2d at 507). Plaintiffs introduced "powerful evidence" of Appellants' "ongoing, sustained pattern of conduct that resulted in numerous injuries to members of the press." *Id.* Based on that powerful evidence, "the district court found that the Federal Defendants had engaged in a pattern of conduct that had persisted for weeks and was ongoing." *Id.*

Appellants argue that these injuries took place "over an extended period" (AOB 23), but the district court found that federal agents inflicted at least 45 such injuries in only 15 days. *Index Newspapers*, 977 F.3d at 827-29. And, just as in *Thomas*, several journalists and legal observers "had been injured by the Federal Defendants more than once." *Index Newspapers*, 977 F.3d at 826. Thus, the possibility of recurring injury "cease[d] to be speculative." *Id.* (quoting *Thomas*, 978 F.2d at 507).

**Second**, *Lyons* is inapposite because there, the plaintiff was just "one citizen in a very large city," making it unlikely that he would again be the victim of a police chokehold. *Thomas*, 978 F.2d at 507-08. By contrast, in *Thomas*, the plaintiffs lived in "a small six by seven block area" in which "numerous instances of police misconduct ha[d] occurred," showing that they were likely to suffer future injury. 978 F.2d at 507-08. Plaintiffs here are like those in *Thomas*. They were covering protests in a small area "centered around the Mark O. Hatfield Federal Courthouse" when federal agents inflicted injuries upon them. *See Index Newspapers*, 977 F.3d at 822. The protests were ongoing at the time of the preliminary injunction and continue to this day.[13] And Appellants argued and continue to argue that "allowing journalists and legal observers to remain 'is not a practicable option.'" (ER 83 (quoting SER 381); AOB 29-32.[14]) Thus, far from being "speculative," it is practically guaranteed that without injunctive relief, federal agents will again subject Plaintiffs to violence. (ER 45.)

---

[13] @PDocumentarians, Twitter (Nov. 8, 2020, 5:01 P.M.) (federal agents responded to protests on November 7), https://twitter.com/PDocumentarians/status/1325604378426843136.

[14] For that matter, one of Appellants' commanding officers expressed in an email his view that the district court's injunction was "offensive" and that it "shouldn't affect anything [federal agents are] doing" in Portland. (SER 107.)

**Third**, *Lyons* and the other cases Appellants cite all involve injuries that occur only after a plaintiff commits a future "violation of an unchallenged law." *Nelsen v. King Cty.*, 895 F.2d 1248, 1252 (9th Cir. 1990); *see, e.g.*, *Lyons*, 461 U.S. at 105-06 (plaintiff would have to violate law, encounter police, and be put in a chokehold); *Updike v. Multnomah Cty.*, 870 F.3d 939, 948 (9th Cir. 2017) (plaintiff would suffer injury only if he violated law and was "arrested and detained in the future"); *Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1267 (11th Cir. 2018) (plaintiff would have to commit crime of some "seriousness" before being subjected to chemical spray); *Curtis v. City of New Haven*, 726 F.2d 65, 68 (2d Cir. 1984) ("plaintiffs have not alleged that it is likely that they will be stopped by City police in the future"). By contrast, Plaintiffs here *do* challenge dispersal orders' application to them. Plaintiffs have "firm intentions to take action that would trigger the challenged governmental action," and when they do, they will be "subjected to the challenged governmental action." *See Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1407 (9th Cir. 1991). They therefore have standing to seek preventive injunctive relief. *Id.*

**Fourth**, Plaintiffs' injury "sharply differs from the substantive due process injury asserted in *Lyons*." *Index Newspapers*, 977 F.3d at 826.

Plaintiffs suffer a chilling effect on the exercise of their First Amendment right to observe and report on protests, which is a cognizable, continuing injury, separate from the threat of physical harm. *Id.* (citing *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015)).

Appellants appear to argue that standing to assert a claim for retaliation is somehow distinct from standing to assert a claim for denial of access. (AOB 23.) This is an elementary fallacy. A plaintiff's standing to seek equitable relief depends on the likelihood that the plaintiff will again suffer the same *injury*—not the plaintiff's theory of *liability*. *Lyons*, 461 U.S. at 105. Whether a federal agent shoots them with retaliatory intent or merely to disperse them away from a protest, Plaintiffs suffer the same injury, and thus have standing to litigate either path to liability. In any event, the district court also found that the federal defendants' informal policy or widespread practice permitted agents to retaliate against journalists and legal observers (ER 49), and that too confers standing. *Thomas*, 978 F.2d at 508; *Nordstrom*, 762 F.3d at 911. Nothing more is needed to establish the "real and immediate threat of repeated injury" required to seek injunctive relief. *Lyons*, 461 U.S. at 111.

**B.      Plaintiffs Are Likely to Win on Their Retaliation Claim**

As this Court observed in denying Appellants' request for a stay, Plaintiffs are likely to win on their claim that Appellants retaliated against reporters and legal observers. *Index Newspapers*, 977 F.3d at 826-27. The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a First Amendment retaliation claim, a plaintiff must show (1) that he or she was engaged in a constitutionally protected activity; (2) that the officers' actions would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the protected activity was a substantial or motivating factor in the officers' conduct. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999).

The record fully supports the district court's finding that Plaintiffs satisfy these elements. Appellants do not dispute that Plaintiffs were engaged in constitutionally protected activity, or that shooting, assaulting, and threatening a person of ordinary firmness would chill that person from continuing to engage in that activity. (AOB 25-26.) Indeed, they concede that Plaintiffs provided evidence of "around fifty instances of improper conduct." (AOB 25.) Nevertheless, they invite the Court to second-guess

the district court's "extensive and thorough factual findings," which this Court held provide "robust support for its conclusion that plaintiffs' exercise of their First Amendment rights was a substantial or motivating factor in the Federal Defendants' conduct." *Index Newspapers*, 977 F.3d at 827.

Appellants argue that the district court "improperly discounted" the possibility that federal agents were simply making "split-second decisions." (AOB 25.) Far from it. The district court cited specific instances of clear retaliation, such as when a federal agent "intentionally directed pepper spray at close range into the faces and eyes of the journalists or legal observers" (ER 47; SER 264-265 ¶¶ 4, 9; SER 257-258 ¶¶ 9-13),[15] or when an agent fired a tear-gas canister directly at journalists when there were no protesters around (ER 48; SER 179 ¶ 10),[16] or when an agent forced journalists to disperse despite the TRO and their clearly identifiable status as press (ER 48; SER 279 ¶ 5).[17] The district court found that these incidents, as well as several others, "are all circumstantial evidence supporting retaliatory animus." (ER 43-44, 46-48.) Appellants do

---

[15] https://tinyurl.com/FedsMaceLOs at 9:20; https://tinyurl.com/FedsMaceLOs2.

[16] https://tinyurl.com/FedsGasJournos at 1:31.

[17] https://twitter.com/Rjaellis/status/1286581690626748416.

not even attempt to explain why this finding is clearly erroneous. (AOB 25-26.)

The court's findings are not erroneous at all. Federal agents are highly skilled marksmen with accurate weapons. (SER 4-5, 7; ER 127-130 ¶¶ 27, 37.) Before they shoot, they are capable of assessing whom they are shooting. (SER 9.) If they hit a journalist or legal observer, it is because they intend to do so. Plaintiffs documented dozens of incidents where federal agents shot, beat, or intimidated someone clearly marked as a reporter or legal observer, and in many of those instances, there was no conceivable alternative target.[18] In several cases, federal agents deliberately attacked reporters or groups of reporters even after they had *alerted* the federal agents that they were press. (SER 406-407 ¶¶ 2, 5-7; SER 373-374 ¶¶ 7-9; SER 283 ¶¶ 6-9; SER 279 ¶ 5; SER 183-184 ¶¶ 11-12; SER 179 ¶¶ 8-10.) For instance, federal agents shot Nathan Howard after he screamed that he was press and complied with agents' commands to stay where he was. (SER 407 ¶¶ 6-7.)

---

[18] *E.g.*, SER 367 ¶¶ 2, 4, 6; SER 371 ¶¶ 3-4; 383-384 ¶¶ 3, 6; SER 401-404 ¶¶ 3-7; SER 347-348 ¶ 15; SER 261 ¶¶ 4-6; SER 257-258 ¶¶ 9-13; SER 264-265 ¶¶ 8-10; SER 406-407 ¶¶ 2, 5-7; SER 372-373 ¶¶ 7-9; SER 283 ¶¶ 6-9; SER 183-184 ¶¶ 11-12; SER 179 ¶¶ 8-10; SER 274-275 ¶¶ 2, 4-6; SER R267-268 ¶¶ 2, 4-7; SER 271-272 ¶¶ 2-3, 8.

Further showing retaliatory animus, federal agents shot several journalists in the back, even though they know that shooting people in the back is wrong. (SER 11 at 34:14-21; SER 2 at 37:18-25.) They shot Plaintiff Lewis-Rolland 10 times with his back turned. (SER 420-422 ¶¶ 13-15.) They shot *Courthouse News* reporter Karina Brown twice in the buttocks at close range. (SER 377 ¶ 11.) They shot Kathryn Elsesser from behind, when she was all alone, simply walking away from federal agents she had photographed. (SER 274-275 ¶¶ 4-6.)

They shot several others in other inappropriate areas, such as in the head, which is not how such munitions should be used. (SER 420-423 ¶¶ 13-16; SER 404 ¶ 7; SER 384 ¶ 6; SER 335-336 ¶¶ 5-13; SER 256-257 ¶¶ 5-8; SER 252-254 ¶¶ 5-7; SER 390-391 ¶ 7; ER 128-129 ¶¶ 31, 33.) They shot Haley Nicholson in the heart from four feet away. (SER 252-254 ¶¶ 3-7.) They shot several journalists with munitions that should not be shot at the body at all, such as pepper balls, tear-gas canisters, and flash-bang grenades. (SER 426-429 ¶¶ 4, 13-14; SER 398 ¶ 5; SER 377 ¶¶ 10-13; SER 407 ¶ 7; SER 283 ¶¶ 20, 24; ER 128-129 ¶¶ 32, 34.) All these uses of force were excessive. (SER 128-132 ¶¶ 30-41.)

There is no explanation for such conduct other than intimidation and retaliation, and Appellants offer none. Lack of any nonretaliatory reason is

strong evidence that retaliatory animus was a substantial motivating factor. *Mendocino Envtl. Ctr.*, 192 F.3d at 1300-01. Based on all this evidence, the district court found that "Plaintiffs provide[d] substantial circumstantial evidence of retaliatory intent." (ER 49.) As this Court held, that finding is supported by "exceptionally strong" evidence. *Index Newspapers*, 977 F.3d at 829.

Appellants offer some of the same excuses for their conduct as they did below. They argue that Plaintiffs documented only "sporadic" and "isolated" misconduct over "thousands of interactions . . . in the months after May 26, 2020." (AOB 26) In fact, however, most of these incidents occurred in a mere 15-day span. *Index Newspapers*, 977 F.3d at 828-29. They were thus not sporadic or isolated at all but "frequen[t]" and "consisten[t]." (*Cf.* AOB 26.)

Appellants also argue that the agencies' policies formally prohibit retaliation and that only a few individual agents engaged in "*ultra vires* misconduct." (AOB 26.) But Appellants cannot escape their "actual routine practices" by "pointing to a pristine set of policies." (ER 49 (quoting *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016) (en banc)).) The district court expressly found, based on "the number of alleged acts and the expert testimony of Mr. Kerlikowske," that Appellants'

conduct did not reflect "a policy or practice of respecting First Amendment rights." (ER 49; *see also supra* n.5 and accompanying text.) That finding was not clearly erroneous.

### C.   Plaintiffs Are Likely to Win on Their Access Claim

Appellants have admitted that their policy is to disperse everyone at the protests, without differentiating among protesters, rioters, journalists, and legal observers. (AOB 21.) They seek to justify this as necessary to protect federal property and law enforcement. (*Id.*) But as the district court found, they face no danger from journalists and legal observers, and can safely disperse crowds of protesters and rioters while permitting journalists and legal observers to remain. (ER 54-55.) For that reason, dispersing journalists and legal observers is not narrowly tailored and violates the First Amendment—especially when the dispersal orders are issued *ultra vires*, off federal property.

Plaintiffs' right to observe, record, and report on how Appellants police protests, interact with protesters, and enforce their dispersal orders is governed by *Press-Enterprise II*.[19] Under *Press-Enterprise II*, the Court examines: (1) whether the place and process to which Plaintiffs seek access

---

[19] In their stay briefing, Appellants argued otherwise. (Dkt. 7 at 20.) They now appear to concede this point.

have historically been open to the press and general public, and (2) whether

public access plays a significant positive role in the functioning of the

process in question. 478 U.S. at 8-9; *Leigh*, 677 F.3d at 900; *Index*

*Newspapers*, 977 F.3d at 829-30. If so, then Plaintiffs have a right of

access, and the government may overcome it only by showing "that it has

'an overriding interest based on findings that closure is essential to

preserve higher values and is narrowly tailored to serve that interest.'"

*Index Newspapers*, 977 F.3d at 829 (quoting *Press-Enterprise II*, 478 U.S.

at 9).

### 1. Public Streets, Sidewalks, Parks, and Protests Have Traditionally Been Open to the Press and the Public

As both this Court and the district court held, "public streets,

sidewalks, and parks historically have been open to the press and general

public." (ER 52); *Index Newspapers*, 977 F.3d at 830 (citing *Hague v.*

*Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)). Appellants agree that

this is an "uncontroversial principle," but they argue that "public streets

and parks . . . *after* officers have responded by issuing lawful dispersal

orders" have *not* historically been open to the public. (AOB 20 (emphasis

added).) This argument misapplies *Press-Enterprise II*.

Under Appellants' logic, preliminary criminal hearings *after* a lawful

closure order, voir dire hearings *after* a lawful closure order, criminal trials

*after* a lawful closure order, horse gathers *after* access has lawfully been limited to designated viewing areas, and newly filed nonconfidential civil complaints that have not *yet* been the subject of judicial action would all fall outside the doctrinal framework of *Press-Enterprise II*. But no court has taken such a circular view of the right of access. *Press-Enterprise II*, 478 U.S. at 10 (considering whether "the right of access applies to preliminary hearings" generally); *Press-Enter. Co. v. Superior Court of California*, 464 U.S. 501, 505 (1984) ("*Press-Enterprise I*") ("the process of selection of jurors" generally); *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 605 (1982) ("criminal trials" generally); *Leigh*, 677 F.3d at 900 ("horse gathers" generally); *Courthouse News Serv. v. Planet*, 947 F.3d 581, 590-92 (9th Cir. 2020) ("no court has held or even suggested that the public character of judicial records depends on whether the proceedings have progressed to a stage requiring a judge to act on the papers").[20] This Court followed those precedents when it examined the public's access to city streets and the public nature of protests and boycotts.

---

[20] Nor does it matter if a statute permits closure: *Press-Enterprise II* found a right of access even though California law permitted judges to close the proceedings at issue. 478 U.S. at 3-4, 13-15.

*Index Newspapers*, 977 F.3d at 830. Thus, the first element of the *Press-Enterprise II* test is met. (*See* ER 52 & n.10.)

### 2. Public Access Plays an Important Role in Holding the Government Accountable

The second element of *Press-Enterprise II* is also met: Permitting Plaintiffs to observe and report on how law-enforcement agents police protests and disperse crowds facilitates their accountability to the public. (ER 87-88; ER 187.)

Public access to government operations "not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally." *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011). As this Court has explained, the press plays a "vitally important role" in this process by acting as surrogates for the public. *Index Newspapers*, 977 F.3d at 831; *Leigh*, 677 F.3d at 900. People have "but limited time and resources with which to observe at first hand the operations of [their] government." *Index Newspapers*, 977 F.3d at 831 (quoting *Cox Broad. Corp.*, 420 U.S. at 490-91). If they want to know what their public servants are doing in their name, they necessarily must rely upon the press. *Id.* Appellants do not appear to dispute this element of the test. (AOB 18-21.) Thus, Plaintiffs have a qualified right of access to law-enforcement activity at protests on public streets, sidewalks, and parks.

### 3. Appellants' Arguments that the Rights of Journalists and the Public Are Coextensive Are Misplaced

Appellants argue that despite *Press-Enterprise II* and *Leigh*, they may lawfully disperse press and legal observers when they disperse protesters because the First Amendment gives press and legal observers no greater rights than anyone else. (*E.g.*, AOB 16.) This is a false syllogism for at least two reasons. First, the district court did not evaluate whether the public had a right to remain in the forum; it simply held that Appellants' blanket dispersal policy was not narrowly tailored *as to Plaintiffs* because it swept them in even though they posed no threat to law enforcement.[21] (ER 52-56.)

Second, journalists and legal observers are engaged in different *conduct* than protesters, even when they occupy the same forum, and their claims are therefore evaluated under different standards. Protesters seek to speak and assemble. Such claims are evaluated under the forum-analysis framework. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Plaintiffs, however, seek a right to access and observe government activities. Access claims are evaluated under the two-part test

---

[21] The district court did, however, note that Appellants were not authorized to issue dispersal orders off federal property. (ER 14-15 & n.2; ER 52 n.10); *see* Part I.C.5, *infra*.

of *Press-Enterprise II*. *Leigh*, 677 F.3d at 898 & n.3. The latter test has no bearing on others' right to speak, even if at the same time and in the same place. *See Leigh*, 677 F.3d at 900 ("The district court focused mostly on its conclusion that Leigh was not treated differently than other members of the public, a consideration that is not part of the *Press-Enterprise II* balancing test."). Thus, *Press-Enterprise II* established a right to access certain criminal proceedings but not a right to heckle the judge, and *Leigh* concerned a right to access horse roundups but not a right to demonstrate against them. *See Press-Enterprise II*, 478 U.S. at 8-9; *Leigh*, 677 F.3d at 900-01.

Appellants argue that under the access cases, the outcome does not turn on the "journalistic status" of the plaintiff. (AOB 18-19.) This is a straw man—Plaintiffs make no such argument. As this Court explained, "the *Press-Enterprise II* test is not dependent upon plaintiffs' occupation, and plaintiffs do not argue that it affords them a special right of access not shared by the general public." *Index Newspapers*, 977 F.3d at 829-30. If a journalist seeks to engage in protest, she has no more right than any other protester. But here, Plaintiffs seek to observe and report on protests, and

under *Press-Enterprise II* and *Leigh*, they have a qualified right to do so even if Appellants may lawfully disperse protesters.[22]

### 4. Appellants' Blanket Dispersal Policy Is Not Narrowly Tailored to Any Legitimate Interest

Appellants can defeat Plaintiffs' qualified right of access only if dispersal is "narrowly tailored to serve" an "overriding interest based on findings that closure is essential to preserve higher values." *Press-Enterprise II*, 478 U.S. at 9; *Index Newspapers*, 977 F.3d at 829.[23] Appellants claim that their blanket dispersal policy is justified by their interest in "protecting federal property and personnel." (AOB 21.) Even accepting that Appellants "have a strong interest in protecting federal property and persons on federal property," the district court did not clearly

---

[22] *California First Amendment Coalition v. Calderon*, 150 F.3d 976, 981-82 (9th Cir. 1998), does not help Appellants. (*Cf.* AOB 12, 16.) There, this Court allowed San Quentin to prohibit witnesses from viewing executions before the inmate was strapped to the gurney. *Id.* The decision was based on deference to prison policy and involved a situation where the press and the public were engaged in the exact same activity. *Id.* Here, the press and protesters are engaged in different activities.

[23] In *Courthouse News*, this Court applied a lower standard of scrutiny than in *Press-Enterprise II* and *Globe Newspaper*, reasoning that strict scrutiny was unwarranted because the closure there resembled time, place, and manner restrictions. 947 F.3d at 595. Not so here: Appellants' blanket dispersal policy is a complete ban on First Amendment activity at the most critical time of a protest. *See supra* at p.10. Similarly, under forum analysis, Appellants' policy would fail because it is viewpoint-based and fails to leave alternative opportunities for access, as explained in Part I.C.6, *infra*.

err in finding that blanket dispersal is not narrowly tailored to serve that interest. (ER 53); *Index Newspapers*, 977 F.3d at 833; *Leigh*, 677 F.3d at 900 (whether a policy is narrowly tailored is a "fact-intensive" question); *Reed v. Lieurance*, 863 F.3d 1196, 1212 (9th Cir. 2017) (similar); *see also McCullen v. Coakley*, 573 U.S. 464, 493 (2014) (statewide buffer-zone law not narrowly tailored where evidence showed protests occurred "only once a week in one city at one clinic").

To be narrowly tailored, a policy must not "restrict more protected speech than is necessary." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 814 (9th Cir. 2013). Thus, in *Board of Airport Commissioners v. Jews for Jesus, Inc.*, the Supreme Court struck down an ordinance that prohibited "all 'First Amendment activity'" in an airport terminal, even though it was not a traditional public forum. 482 U.S. 569, 570, 574-75 (1987). The ordinance was aimed at activities that might cause congestion, such as canvassing, but the Court held that it was not narrowly tailored because it unnecessarily swept in protected activities such as "wearing of campaign buttons or symbolic clothing." *Id*. Similarly, the Supreme Court held that a "total ban" on demonstrating outside the Court was not narrowly tailored where no evidence showed that the defendants' conduct posed a threat or interfered

with orderly administration. *United States v. Grace*, 461 U.S. 171, 182-83

(1983)

Just so here: Appellants' blanket dispersal policy is not narrowly

tailored because federal agents face no danger from journalists and legal

observers. As the district court found:

> Plaintiffs' expert witness Mr. Kerlikowske provides
> qualified, relevant, and persuasive testimony showing
> that [allowing journalists and legal observers to remain]
> is workable. He also explains that during his tenure in
> Seattle, law enforcement did not target or disperse
> journalists and there were no adverse consequences.
> Numerous declarants also testified that they were not
> dispersed during protests in other locations. Thus, it is
> workable and feasible to disperse protesters generally but
> not require the dispersal of journalists and authorized
> legal observers. The Federal Defendants' blanket
> assertion that federal officers must disperse everyone is
> rejected.

(ER 53-54.) These are factual findings entitled to clear-error review and

they are amply supported by the record. *Index Newspapers*, 977 F.3d at

833-34. Allowing press to remain, unharmed, is something law

enforcement has safely done in hundreds of similarly chaotic protests. (ER

121-127 ¶¶ 3-4, 9, 15-19, 21, 28.) If Appellants actually perceived any risk,

they could leave an officer back to liaise with press who are behind a

skirmish line. (*Id.* ¶¶ 16-17.) The "availability of [such] obvious less-

restrictive alternatives renders [Appellants' blanket-exclusion policy]

overinclusive." *Valle Del Sol*, 709 F.3d at 826; *see Glik*, 655 F.3d at 84

("peaceful recording of an arrest in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation").

Further proving that Appellants' blanket dispersal policy is overinclusive is "the City's ability to comply with a similarly worded injunction." *Index Newspapers*, 977 F.3d at 833. The City not only complied, it *stipulated* to such an injunction after two weeks of operating under a TRO containing "nearly identical" terms after finding that the injunction was workable and safe. (ER 53.) Appellants argue that this evinces only a "divergent assessment of the severity of the threat" (AOB 35), but as the district court recognized, that divergent assessment *is itself* "compelling evidence that exempting journalists and legal observers is workable." (ER 53.[24])

---

[24] Appellants claim difficulty understanding why the City exempts journalists and legal observers but not medics from dispersal orders (AOB 35-36), but the City stated its reasons on the record: "The journalists, the media observers, legal observers, they're passive. They stand there and they watch and they report." Transcript at 42:7-14, *Wise v. City of Portland*, No. 3:20-cv-1193 (D. Or. Sep. 9, 2020), Dkt. 50. Appellants also argue that the injunction governing them "extend[s] special protection to journalists or legal observers who are engaged in protest activity" (AOB 36), but as explained *infra* at p.65, that is untrue.

Appellants raise the specter of "imposters seeking to exploit the court's injunction." (AOB 32.) But despite several opportunities below, they offered no evidence that any person marked as a journalist or legal observer harmed a federal agent or anyone else. (ER 35-36 ("The Federal Defendants do not assert that journalists or legal observers caused [any of the asserted] injuries.").) Moreover, the district court carefully crafted its injunction not to protect persons committing unlawful acts: "The Federal Defendants have the same authority to arrest or otherwise engage with persons who commit unlawful acts, regardless of their clothing." (ER 55); *Index Newspapers*, 977 F.3d at 833-34. Thus, going beyond this authority and shooting and arresting persons protected by the injunction is the casebook definition of overinclusive. *See* Eugene Volokh, *The First Amendment and Related Statutes* 262 (4th ed. 2011).

Appellants' policy also fails to significantly advance its stated goal of protecting officer safety and federal property. As Mr. Kerlikowske explained, law-enforcement officers protecting a building usually create a perimeter around it, and from there they would have "no reason to target journalists or legal observers or disperse them." (ER 123 ¶ 8.[25]) Federal

---

[25] Citing the declaration of Chris Bishop, Appellants dispute this point (AOB 32), but in so doing they invite this Court to improperly second-

agents agreed with this assessment, testifying that they are able to distinguish between journalists or legal observers and people doing something dangerous, and that they are able to shoot only at people doing something dangerous. (SER 4-10 at 15:11-16:5, 18:12-13, 22:18-23:11, 25:2-16, 27:15-21.) Thus, "a substantial portion of the [blanket dispersal policy's] burden on speech does not serve to advance its goals," which is a second and "particularly compelling" reason why it fails the narrow tailoring requirement. *Berger v. City of Seattle*, 569 F.3d 1029, 1045-46 (9th Cir. 2009) (en banc) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

For all these reasons, shooting clearly marked press or legal observers, who are committing no crime but simply documenting how federal agents interact with protesters, is not narrowly tailored to any legitimate government interest.

### 5. Appellants Have No Power to Issue Dispersal Orders on City Streets

Appellants' blanket dispersal policy is invalid for a second reason: When federal agents are off federal property, they have no power to issue

---

guess the district court's factual finding that Mr. Kerlikowske is the more credible declarant. (ER 32 n.4.)

dispersal orders. Appellants can have no "overriding interest" in executing

*ultra vires* dispersal orders. *Cf. Index Newspapers*, 977 F.3d at 832.

The federal government, including DHS, has no general police

powers. *United States v. Morrison*, 529 U.S. 598, 618-19 n.8 (2000) ("the

Constitution created a Federal Government of limited powers, while

reserving a generalized police power to the States" (cleaned up)). Its

authority in the interior is enumerated in 40 U.S.C. § 1315(b)(2). Section

(b)(2)(A) provides that DHS agents may enforce federal law on federal

property; section (b)(2)(C) allows them to make arrests for federal offenses

committed in their presence; and section (b)(2)(E) enables them to

"conduct investigations, on and off federal property." None of these

provisions includes a general police dispersal power, let alone away from

federal property. Because journalists and legal observers pose no threat to

persons or federal property (ER 51), are not on federal property, and have

not committed any federal crimes, federal agents cannot disperse them.[26]

---

[26] DHS's implementing regulations cannot expand its power and simply
confirm that its authority is restricted to persons "entering in or on Federal
property." *E.g.*, 41 C.F.R. §§ 102-74.380, 102-74.390; *see also Moore v.
United States*, 254 F. App'x 603, 604 (9th Cir. 2007). Even 41 C.F.R.
§ 102-74.385, which requires "[p]ersons in or on property" to obey federal
agents' lawful orders, has been construed to include the requirement that
the persons be on *federal* property. *See United States v. Baldwin*, 745 F.3d
1027, 1029 (10th Cir. 2014) (Gorsuch, J.).

Failing to find authority for their dispersal orders in § 1315(b)(2), Appellants resort to language in subsection (b)(1) about duty "outside" federal property. (AOB 17-18.) But that section only supplies the Secretary of Homeland Security with the power to "designate" DHS agents for "duty in connection with the protection of [federal] property." The powers of agents so designated are enumerated in subsection (b)(2), not in subsection (b)(1). Thus, subsection (b)(1) allows that designated agents may be assigned duty "in areas outside the property to the extent necessary to protect the property," but subsection (b)(2) specifies exactly what duty such agents may conduct outside federal property, and it does not include a general police dispersal power.[27] Recognizing this, Appellants' commander admitted that federal agents had no power to disperse protesters even one block from federal property. (SER 114 at 63:12-18.)[28]

_____

[27] Section (e), entitled "Authority Outside Federal Property," provides that DHS can make agreements with local authorities to expand its powers off federal property. Appellants concede that local authorities made no such agreement. (AOB 6, 35.)

[28] Federal agents' deployment to the streets of Portland may have been unlawful for a number of other reasons. First, Acting Secretary Wolf may have been unlawfully appointed to his position, making any order he issued ultra vires. *See Legality of Service of Acting Secretary of Homeland Security*, U.S. Gov't Accountability Off. (Aug. 14, 2020), *available at* https://www.gao.gov/assets/710/708830.pdf; *Vidal v. Wolf*, 2020 WL 6695076, at *1 (E.D.N.Y. Nov. 14, 2020). Furthermore, even if not *ultra*

Even if this textual transplant from § 1315(b)(1) to (b)(2) were successful, Appellants cite no *federal* law they might be enforcing when they disperse entire crowds. Their lone case, *United States v. Evans*, 581 F.3d 333 (6th Cir. 2009), concerns an investigative search under section (b)(2)(E) and arrest under (b)(2)(C); it does not hold that DHS has general police powers. Since federal agents cannot issue dispersal orders, and since the City's dispersal orders do not apply to journalists and legal observers, ER 14-15 & n.2, federal agents have no power to disperse press who are not on federal property. Thus, when they are off federal property, their interest in shooting and dispersing persons they know or reasonably should know are journalists or legal observers is at its nadir.

### 6. Denying Plaintiffs Access Leaves Them No Alternative Observation Opportunities

Evaluating Plaintiffs' claim using forum analysis, as Appellants have at times proposed, yields the same result. Plaintiffs seek access to public streets and parks, which are "quintessential public forums." *Perry*, 460 U.S. at 45. In such forums, the government may enforce a content-neutral restriction on speech if it is narrowly tailored and leaves open "ample alternative channels of communication." *Id.*

---

*vires*, the designation itself may have been invalid because it was not individualized. *See* n.7, *supra*.

First, Appellants' dispersal policy is not content-neutral: It is viewpoint-based because it allows the government to document and report on the protests, while preventing journalists and legal observers from doing so. (*See* SER 193 ¶ 2, ER 151 ¶ 2 (submitting photographs and video from Appellants' "Response Imagery Coordinator" and "Public Affairs Specialist").) It is thus subject to strict scrutiny, which is "strict in theory but usually fatal in fact." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); *Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984) (quotation marks omitted).

Second, for the reasons in Part I.C.4, *supra*, excluding journalists and legal observers from the scene of protests and law-enforcement activities is not narrowly tailored under any level of scrutiny.

Third, blanket dispersals fail to leave Plaintiffs any "alternative observation opportunities," much less "ample" ones. *See Reed*, 863 F.3d at 1211-12. Appellants argue that Plaintiffs' "ability to gather news" is unaffected by being dispersed from the scene of protests. (AOB 2.) This argument defies both constitutional law and the laws of physics. As the district court found, "[f]ederal agents are using tear gas, which decreases visibility, and the protests are at night. Reporting from a few blocks away is not a viable alternative location." (ER 88.) This is a separate reason that

Appellants' policy violates the First Amendment. *Reed*, 863 F.3d at 1211-12.

## II. WITHOUT AN INJUNCTION, PLAINTIFFS ARE LIKELY TO BE IRREPARABLY HARMED

Because the loss of First Amendment freedoms, "even for minimal periods of time, unquestionably constitutes irreparable injury," a party can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a "colorable First Amendment claim." *Index Newspapers*, 977 F.3d at 837-38 (quotation marks omitted); *Warsoldier*, 418 F.3d at 1001.

Appellants do not seriously contest this element; they simply rest on their arguments about standing and success on the merits. (AOB 28-29.[29]) As the district court found, Appellants' conduct chilled and prevented journalists from reporting on the protests, and "it is likely that . . . journalists and legal observers will face such treatment again if they cover protests in Portland policed by agents of the Federal Defendants." (ER 44-45); *see also Index Newspapers*, 977 F.3d at 837-38. Appellants do not challenge those factual findings here. Because Plaintiffs have raised *at least* a colorable claim that their constitutionally protected right to record

---

[29] Appellants appear to have abandoned their district-court argument that they have voluntarily ceased their misconduct. (*Cf.* ER 56-64.)

government activity in public has been infringed, they have satisfied the

irreparable-injury requirement.

## III. THE PUBLIC'S INTEREST AND BALANCE OF EQUITIES WEIGH STRONGLY IN FAVOR OF PLAINTIFFS

### A. The Public Has an Unassailable Interest in a Free Press

In the context of preliminary injunctions, courts have "consistently

recognized the significant public interest in upholding First Amendment

principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012)

(quotation marks omitted); *Index Newspapers*, 977 F.3d at 837-38. That is

why, when a plaintiff "raise[s] serious First Amendment questions," the

balance of hardships "tips sharply in [the plaintiff's] favor." *Cmty. House*,

490 F.3d at 1059 (alterations in original) (quotation marks omitted). And it

is "always in the public interest to prevent the violation of a party's

constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.

2012) (quotation marks omitted) (granting injunction under Fourth

Amendment).

Not only do speakers have a right to speak and press a right to

observe, but the public has a right to *know*. *Grosjean v. Am. Press Co.*, 297

U.S. 233 (1936) (striking down tax on press because it would "limit the

circulation of *information to which the public is entitled* in virtue of the

constitutional guaranties" (emphasis added)). Indeed, the "Constitution

specifically selected the press . . . to play an important role in the discussion of public affairs" to serve as a "powerful antidote to any abuses of power" by "keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966) (citation omitted); *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) ("The press was protected [by the First Amendment] so that it could bare the secrets of government and inform the people."). "Filming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy." *Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017). Thus, as this Court held, "excluding the media from public fora can have particularly deleterious effects on the public interest." *Index Newspapers*, 977 F.3d at 830.

The media's role in informing the public is especially important here, where the protests and the federal response have been issues of nationwide political debate.[30] "The Free Speech Clause exists principally to protect

---

[30] *See, e.g.*, Mike Baker, *A 'Wall of Vets' Joins the Front Lines of Portland Protests*, N.Y. Times (July 25, 2020), https://www.nytimes.com/2020/07/25/us/a-wall-of-vets-joins-the-front-lines-of-portland-protests.html; John Wagner & Marissa J. Lang, *Trump derides Portland mayor for joining protesters and getting tear-gassed*,

discourse on public matters." *Brown v. Entm't Merch. Ass'n*, 564 U.S. 786, 790 (2011). It reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). It is "[p]remised on mistrust of governmental power." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). "[I]t furthers the search for truth," *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018), and "ensure[s] that . . . individual citizen[s] can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604. Unless the constitutional rights of journalists are protected, the public's ability to participate meaningfully as citizens in a constitutional democracy will be severely diminished.

### B.    The Preliminary Injunction Is Workable

Appellants claim that the injunction is unworkable. (AOB 29-37.) But, as explained above, the district court carefully reviewed the evidence, including the City's ability to work under the same restrictions and expert

---

Washington Post (July 24, 2020),
https://www.washingtonpost.com/politics/trump-derides-portland-mayor-for-joining-protesters-and-getting-tear-gassed/2020/07/24/bd8d1884-cdbd-11ea-91f1-28aca4d833a0_story.html.

testimony from Mr. Kerlikowske, and found that "it is workable and feasible to disperse protesters generally but not require the dispersal of journalists and authorized legal observers." (ER 53-54.) This was not clear error; as this Court already held, the record "fully supports" this conclusion because journalists and legal observers "have not threatened federal property, and the journalists, in particular, provide a vitally important service to the public." *Index Newspapers*, 977 F.3d at 838.

Appellants suggest that the injunction is too "vague" to follow. (AOB 29-30, 34.) It is not vague: It is an "unambiguous statement of actions [federal agents] may and may not take in the field." *Index Newspapers*, 977 F.3d at 835. It protects persons whom federal agents "know or reasonably should know is a Journalist or Legal Observer." (ER 67 ¶ 1.) The government routinely enforces this same knowledge standard. *See, e.g.*, 26 U.S.C. § 6700(a)(2)(A) (prohibiting tax strategies that "the person knows or has reason to know is false or fraudulent"); 18 U.S.C. § 231(a)(1) (prohibiting teaching how to make firearm while "knowing or having reason to know or intending that the same will be unlawfully

employed").[31] This Court has not found such standards impermissibly vague. *Stoianoff v. Montana*, 695 F.2d 1214, 1221 (9th Cir. 1983).

To assist federal agents in complying with the injunction, the district court offered non-exclusive, commonsense indicia that a person is a journalist—factors like using professional photographic equipment or wearing a press pass. (ER 67-68.) Appellants cite fragments of this guidance and claim that they make the injunction vague. (AOB 29-30.) But they do not explain why such guidance renders infirm a rule that mirrors a common legal standard.

Appellants also set up a series of strawmen. They argue that the injunction protects persons "actively participating in protests that have turned violent." (AOB 1, 9, 14, 30.) This is untrue. The district court listed "not engaging in protest activities" as an indicium of being a journalist. (ER 68-69.) But by stating that none of the indicia are "requirements," the district court did not direct federal agents to "apply the exemption even if journalists and legal observers are actively participating in protests that have turned violent." (*Cf.* AOB 14.)

---

[31] *See also, e.g.*, 18 U.S.C. § 1512(1); 18 U.S.C. § 1839.

Appellants argue that the injunction requires officers to determine whether "every individual affected by crowd-control tactics" bears any indicia of journalist or legal-observer status. (AOB 30-31.) This is also untrue. The injunction shields federal agents from liability if, in using crowd-control tactics against a crowd that they have lawfully ordered to disperse, they "incidentally expose[]" journalists or legal observers to crowd-control devices. (ER 69 ¶ 6.) Liability attaches under the injunction only if federal agents *target* "person[s] whom they know or reasonably should know is a Journalist or Legal Observer." (ER 67 ¶ 1.) And even then, the injunction includes an exemption for persons who "impede, block, or otherwise physically interfere with the lawful activities of the Federal Defendants." (*Id.*); *Index Newspapers*, 977 F.3d at 833-34.

Appellants argue that the district court gave "short shrift" to their evidence that protesters disguised as journalists were injuring federal agents and harming federal property. (AOB 31.) Besides improperly asking this Court to reweigh the evidence, this assertion is untrue. The district court carefully reviewed the evidence Appellants submitted and concluded that Appellants had failed to show "that journalists or legal observers caused [any of the asserted] injuries." (ER 35-36.) For the most part, it "did not find persuasive evidence of any wrongdoing." (ER 36-37.) And

ultimately, it found that even if "a few people may have engaged in some unlawful conduct," that did not "outweigh the important First Amendment rights of journalists and legal observers and the public for whom they act as surrogates." (ER 65-66.) Appellants do not argue that this assessment is clearly erroneous. It is not.

Appellants also object to the portion of the injunction requiring them to wear identification. (AOB 32-33.) The district court's finding that such identification would deter retaliation and increase accountability was linked to the misconduct the court found and was not clearly erroneous. (ER 55; Dkt. 135 ¶ 42.) In any event, the district court has not yet modified its injunction to set forth any definite identification standard for this Court to review.

Appellants state that they are "unaware of[] any precedent for a preliminary injunction that binds hundreds of officers . . . who have not violated the law and are not parties to this litigation." (AOB 33.) This argument ignores that Plaintiffs are challenging improper policies.

Finally, Appellants offer some objections already addressed in the narrow-tailoring analysis above. They argue that the injunction threatens sanctions for erroneous "snap judgments"; that officers are incapable of determining whether a person in their crosshairs is a journalist or a

protester; and that the only way to effectively police protests is to disperse *all* "non-law-enforcement personnel." (AOB 31-32, 36-37.) As explained above, all these arguments improperly seek to reweigh the evidence. Based on the experience of the Portland police, the testimony of federal agents, and the unrefuted expert testimony of Mr. Kerlikowske, the district court found that trained police can identify press and avoid targeting journalists. (*See supra* Part I.C.4.) The record "fully supports the district court's conclusion." *Index Newspapers*, 977 F.3d at 838. Thus, the injunction properly balanced the equities and served the public's interest.

## <u>CONCLUSION</u>

For all these reasons, the district court's judgment should be affirmed.

Dated: November 16, 2020          Respectfully submitted,


By: */s/Matthew Borden*
            Matthew Borden
            J. Noah Hagey
            Athul K. Acharya
            Gunnar Martz
            Ronald J. Fisher

            BRAUNHAGEY & BORDEN LLP
            Counsel for Plaintiffs-Appellees

# CERTIFICATE OF COMPLIANCE

I hereby certify that this opposition complies with the requirements of Federal Rule of Appellate Procedure 28, Circuit Rule 32-1(a) and Circuit Rule 32-3(2) because it has been prepared in 14-point Times New Roman, a proportionally spaced font, and it contains 13582 words according to the count of Microsoft Word.